## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

CASE NO:_____

HANTON WALTERS,

     Plaintiff,

v.

NAVIENT CORPORATION, NAVIENT
SOLUTIONS, LLC f/k/a NAVIENT
SOLUTIONS, INC. f/k/a SALLIE MAE, INC.,
and SLM CORPORATION,

     Defendants

_____/

## <u>COMPLAINT</u>

Plaintiff, Hanton Walters ("Walters"), through his attorneys, bring this action against Defendants Navient Corporation, Navient Solutions, LLC, ("Navient") formerly known as Navient Solutions, Inc. and formerly known as Sallie Mae, Inc., and SLM Corporation ("Sallie Mae") (collectively, "Defendants") for unlawful acts and practices, including manipulating its student loan servicing and collection practices to mislead and deceive borrowers, and allege as follows: Plaintiff allege the following upon personal knowledge, as to himself, and upon information and belief as to all other matters, which is based on, among other things, the independent investigation of the undersigned counsel, which included, *inter alia:* (a) review of available records, (b) review and analysis of relevant filings made by

Defendants with the United States Securities and Exchange Commission ("SEC"); (c) review and analysis of Defendants' press releases and other publicly-disseminated publications; (d) lawsuits filed by the Consumer Financial Protection Bureau ("CFPB"),[1] as well as those filed by the Attorneys General of the State of Illinois, State of Washington, Commonwealth of Pennsylvania, State of California, and State of Mississippi;[2] (e) related federal securities and derivative class actions brought against Defendants;[3] and (f) related class actions brought against defendants.[4]

The investigation into the factual allegations contained herein is continuing, and many of the facts supporting the allegations contained herein are known only to Defendants or are exclusively within their custody or control. Plaintiff believes that further substantial evidentiary support will exist for the allegations contained herein after a reasonable opportunity for discovery.

## INTRODUCTION

[1] *See CFPB v. Navient Corp., et al.*, No. 3:17-CV-00101-RDM (M.D. Pa

[2] *See Commonwealth of Pennsylvania v. Navient Corp.*, *et al.*, No. 3:17-cv-01814-RDM (M.D. Pa.), *People of the State of Illinois v. Navient Corp., et al.*, No. 2017 CH 00761 (Cir. Ct. Cook Cnty. Ch. Div.), *State of Washington v. Navient Corp., et al.*, No. 17-2-01115-1 SEA (King Cnty. Super. Ct.), *State of Mississippi v. Navient Corp., et al.*, No. 25CH1:18-cv-00982 (Miss. Ch. Ct. Hinds Cnty.), and *People of the State of California v. Navient Corp., et al.*, No. CGC-18-567732 (Cal. Super. Ct. San Fran. Cnty.).

[3] See Buffalo Grove Police Pension Fund, et al., v. Diefenderfer, III, et al., No. 2:19-cv-00062 (E.D. Pa.); Lord Abbett Affiliated Fund, Inc., et al., v. Navient Corp., et al., No. 1:16-cv-0012 (D. Del.); and In re Navient Corp. Sec. Litig., No. 1:17-cv-08373 (D.N.J).

[4] See Daniel, et al., v. Navient Solutions, LLC, No. 8:17-cv-0250 (M.D. Fl.); Demyanenko-Todd, et al., v. Navient Corp., et al., No. 3:17-cv-00772 (M.D. Pa.); Hyland, et al., v. Navient Corp., et al., No. 1:18-cv-09031 (S.D.N.Y.); and Travis, et al., v. Navient Corp., et al., No. 2:17-cv-04885 (E.D.N.Y.). *Marie Travis v Navient Corp., et.al.*, No. 2:17-cv-04885 (E.D.N.Y); *Brian Manetta v. Navient et.al.*, No. 2:20-cv-07712 (D. N.J)

1.    In what has become one of the largest and fastest growing debt markets in the United States, millions of Americans currently owe over one trillion dollars in student loan debt. The massive amount of student loan debt has complicated the ability of many borrowers to repay their loans, spawning what is called the "student loan crisis."

2.    The student loan crisis is the result of a myriad of converging factors, including: a growing need to complete a four-year degree to compete in the marketplace, dramatic increases in tuition at institutions offering four-year degree programs, increasing number of students borrowing money to pay for tuition, limitations on the availability of employment with pay sufficient to cover the cost of student loan payments.

3.    The result is an average student loan debt estimated to be between $28,950 and $37,172.80 per borrower.[5]

4.    Even for those making regular monthly student loan payments, student loan debt has significantly impacted borrowers' financial futures. One study found student loan debt delayed homeownership by five years, cost borrowers around $500,000 in lost retirement savings, and significantly reduced lifestyle qualities, including inability to purchase cars and generate future savings.[6]

---

[5] 2016 Report on the Real Cost of Student Loans, Student Debt Crisis (last visited, June 28, 2017), http://studentdebtcrisis.org/4782-2/.
[6] Id.

5.    Since 2010, when the Healthcare and Education Reconciliation Act was passed, the federal government has become the largest holder of student loan debt, amassing $1.291 trillion in owed debt.[7]    The Healthcare and Education Reconciliation Act marked a change in philosophy for federal student loans. Instead of backing private student loans and offering limited federal student loans, the federal government now offers its student loans directly to borrowers.

6.    Federal student loans provide key benefits that private student loans lack, including flexible repayment options. Perhaps the most significant repayment options are income-driven repayment ("IDR") plans which adjust monthly loan payments according to the borrowers' annual incomes. Eligible borrowers can apply for IDR plans and with lower monthly payments and, after 20 to 25 years of repayment, federal student loans in an IDR plan may be forgiven.

7.    The federal government also allows its student loans to be entered into forbearance, which temporarily delays the monthly loan payments for a fee. Forbearance is recommended for borrowers experiencing short-term financial circumstances preventing their ability to make their monthly loan payment. When a borrower's financial distress is expected to be long-term, however, utilizing IDR is the preferred method of managing the borrower's student loan payments.

8.    To manage its direct federal student loan program, the federal

---

[7] A Look at the Shocking Student Loan Debt Statistics for 2017, Student Loan Hero (May 17, 2017).

government contracts with financial providers to service the loans, communicate with borrowers, educate borrowers about repayment options, and help borrowers apply for repayment programs like IDR. Although the Department of Education allows servicers to determine eligibility for and enter borrowers into forbearance, borrowers seeking to enter an IDR program must submit an application and provide documentation demonstrating eligibility for IDR to the Student Aid Office. As compared to forbearance, servicers often must invest more time and resources to determine a borrower's eligibility for IDR and to help borrowers apply.

9.      The Department of Education has regularly encouraged borrowers to contact their student loan servicers for advice and information about repayment options. For example, the Federal Student Aid website states, "[b]efore you apply for an income-driven repayment plan, contact your loan servicer . . . [who] will help you decide whether one of these plans is right for you."[8]

10.     Navient, and other servicers, have also actively advertised their role in educating borrowers about and assisting borrowers with their repayment options. Almost all servicers, including Navient, encourage borrowers to contact them if they have any issues with repayment. For example:

    a.      Nelnet. "We're here to make your student loan repayment as simple as

---

[8] Income-Driven Plans, Federal Student Aid (last visited, Jun. 28, 2017), https://studentaid.ed.gov/sa/repay-loans/understand/plans/income-driven.

possible. This means we: Process your monthly payment. Help you find lower monthly payment options. Guide you through the different stages of your student loan."[9]

b.    Great Lakes. "At Great Lakes, our servicing role includes: Keeping you up-todate with information about your student loans. Monitoring your school enrollment and status while you're in school. Assisting you as you pay back your loans. Helping you find the best repayment plan for your budget."[10]

c.    Mohela. "MOHELA is dedicated to providing world-class customer service for the students whose loans we manage. As your knowledgeable and approachable go-to resource for account information and repayment options, we provide the tools to help you successfully repay your student loan. MOHELA is here to assist you!"[11]

d.    OSLA. "OSLA is available to customers via the web at www.OSLA.org, by email, by mail, toll free phone, and onsite meetings. Borrowers may review account information, make payments and learn about deferments, forbearances, and payment plan options from our web site. Additionally, a borrower may call our customer service department and ask questions about repayment in order to make the best decisions about managing their student loans."[12]

---

[9] Welcome, Nelnet (last visited, Jun. 28, 2017), https://www.nelnet.com/welcome.
[10] Help, Great Lakes, https://www.mygreatlakes.org/educate/help.html.
[11] About, MOHELA, https://schools.mohela.com/about.aspx.
[12] Help, OSLA, https://public2.osla.org/help.aspx.

11.    Navient has also frequently encouraged borrowers to contact it for help with student loan repayment and offered assistance in choosing an appropriate repayment plan. Navient has made numerous statements indicating it will help borrowers choose the most appropriate repayment options for their circumstances, including on its website which states: "[I]f you're having trouble, there are options for assistance, including income-driven repayment plans, deferment, forbearance, and solutions to help you avoid delinquency and prevent default … We can work with you to help you get back on track, and are sometimes able to offer new or temporarily reduced payment schedules. Contact us at 800-722-1300 and let us help you make the right decision for your situation."[13]

12.    Despite these promises, the Consumer Financial Protection Bureau has alleged that Navient utterly failed to provide borrowers with adequate assistance in choosing repayment options. Instead, the CFPB has asserted that Navient directed borrowers towards repayment options that were easy for Navient to manage but costly for borrowers.

13.    IDR can be a complicated system to service. First, servicers must explain IDR to borrowers, many of whom are unaware that monthly payments can be tied to their income. Education, as Navient has acknowledged, is crucial. IDR is

---

[13] Navient: if you are having trouble. https://www.navient.com/loan-customers/postponing-payments/if-you-are-having-trouble/.

not a single repayment option, but encompasses numerous similar options, including: Pay As You Earn ("PAYE"), Revised Pay As You Earn ("REPAYE"), Income-Based Repayment ("IBR"), Income-Contingent Repayment ("ICR"), and more. Second, servicers must determine the borrowers' eligibility for some or all of the program based on their annual income. Based on their eligibilities, borrowers need to then select the most appropriate repayment program. Finally, borrowers must apply for the selected repayment program with the Student Aid Office of the U.S. Department to Education. Applications require additional documented information. Once a borrower is on an IDR plan, the borrower must submit annual documentation demonstrating continued eligibility for the plans. This means servicers must proactively work with borrowers to explain the IDR plans, determine the eligibility of the borrower, assist in applying to the IDR plan, and then, provide annual renewal notices ensuring the borrower's loan retains its IDR status.

14.    Rather than helping borrowers navigate the complex federal student loan repayment system – as Navient promised and advertised – Navient instead pushed borrowers into forbearance. Unlike IDR, for servicers, forbearance is quick and easy. Navient can place borrowers into forbearance on their own volition and can choose when a borrower's financial circumstances warrant forbearance.

15.    Navient's forced-forbearance approach allowed it to skimp on the number of customer service representatives it hired and reduce the lengths of average

call times. In fact, Navient directly incentivized its customer sale representatives to spend as little time as possible on the phone with borrowers by rewarding employees with bonuses for short call times. Motivated to shorten their calls, Navient customer sales representatives often skipped the lengthy discussions about IDR. With less customer service personnel required, Navient saved on expenses.

16.    Although Navient publicly proclaimed it would assist borrowers with their repayment options, Navient implemented a customer service model that encouraged and rewarded the opposite. Navient saved money by curbing its customer service personnel, but its approach devastated borrowers experiencing financial distress.

17.    By ignoring IDR plans and pushing borrowers into forbearance, Navient offered a temporary solution that ultimately aggravated the underlying issue, borrowers unable to meet their monthly loan payment. As borrowers sat in forbearance, their interest continued to compound the principal amount of the loan. These borrowers would have been better served by applying for an IDR program.

18.    As this Complaint will make clear, Navient has proclaimed the need for student loan servicers to educate and assist borrowers, but has implemented a self-interested approach that hurts borrowers. The Plaintiff is just one of the many borrowers who was harmed by Navient's force forbearance approach.

## JURISDICTION AND VENUE

19.    This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1332 which affords federal courts with original jurisdiction over cases where the plaintiff is a citizen of a state different from any defendant and where the amount in controversy exceeds $75,000.00, exclusive of interest and costs. Plaintiff, being a resident of the State of Florida, is diverse from Defendants, both of which are headquartered and incorporated in Delaware. Plaintiff alleges that, in the aggregate, the claims exceed $75,000.00, exclusive of interest and costs.

20.    This Court has personal jurisdiction over Defendants because Defendants have established minimum contacts with Florida including through mailings, billings, and other communications, and advertisements of its services, and Plaintiff's claim arises out of Defendants' contacts with Florida.

21.    This Court is the proper venue for this case pursuant to 28 U.S.C. § 1391(b) because, as Plaintiff is, and at all relevant times was, a resident of Florida residing in the Middle District, a substantial part of the events and omissions giving rise to Plaintiff's claims occurred in the Middle District of Florida.

**PARTIES**

22.    Plaintiff is, and at all relevant times was, a resident of the State of Florida. Plaintiff obtained two direct federal student loans from Sallie Mae to cover the expenses of his college education at Drake University. Both of his student loans were managed by Navient, to whom his loans were automatically assigned by the

U.S. Department of Education. After years of continuous and timely monthly payments, Plaintiff went through a very personal matter that quickly depleted his source of income.

23.    When Plaintiff contacted his loan provider, Navient, having succeeded Sallie Mae as Plaintiff's federal loan servicer, encouraged Plaintiff to put his loans into forbearance. Although Plaintiff was willing and able to pay a reduced amount, Navient told Plaintiff he must either pay the entire monthly installment payment or enter into forbearance. Navient did not inform Plaintiff of other repayment options, such as but not limited to IDR plans, determined whether IDR was appropriate given his financial situation, or assessed his eligibility for IDR.

24.    Defendant Navient Solutions, Inc., is a wholly owned subsidiary of Navient Corporation, and was previously known as Sallie Mae, Inc. Navient Solutions, Inc. engages in the servicing of both federal and private student loans for more than 12 million borrowers, accounting for $300 billion in owed student loans.

25.    Defendant Navient Corporation is a Delaware corporation with its principal place of business at 123 S. Justison Street, Wilmington, Delaware, 19801. Navient Corporation is a loan management, servicing, and asset recovery company.

26.    Following a corporate reorganization in 2014, Navient Corporation became the successor to Sallie Mae, Inc. Originally, Sallie Mae was awarded a servicing contract with the U.S. Department of Education in 2009. That contract

remains in effect today, subject to later modifications. All documents related to that original servicing contract were signed in the name of Sallie Mae or, subsequently, Navient, LLC.

27.    During the corporate reorganization, Navient Corporation assumed certain liabilities related to the servicing and collection activities of Sallie Mae, Inc. and Navient, LLC, and their subsidiaries. Among the liabilities assumed by Navient Corporation were all of the preorganization servicing and collection conduct described in this Complaint. As a result of the 2014 corporate reorganization, Navient Corporation is currently the entity that contracts with the U.S. Department of Education for the servicing of federal student loans.

28.    Navient Corporation is also the direct or indirect owner of all of the stock of Navient Solutions, Inc. Navient Corporation's significant control of Navient Solutions, Inc. suggests it has consented to, has knowledge of, has materially participated in, and/or has controlled the activities of Navient Solutions, Inc. with respect to the conduct alleged in this Complaint.

29.    Navient Corporation owns or leases the offices used by Navient Solutions, Inc., has responsibility for the hiring of employees for Navient Solutions, Inc., and manages all compliance auditing for Navient Solutions, Inc.

30.    The corporate governance and management of Navient Corporation and Navient Solutions, Inc. demonstrates significant overlap. For example, several

directors and officers of Navient Corporation are also directors or officers of Navient Solutions, Inc., including: Jack Remondi (President and Chief Executive Officer for both Navient Corporation and Navient Solutions, Inc.), John Kane (Chief Operating Officer for both Navient Corporation and Navient Solutions, Inc.), Somsak Chivavibul (Chief Financial Officer for both Navient Corporation and Navient Solutions, Inc.), Timothy Hynes (Chief Risk Officer for both Navient Corporation and Navient Solutions, Inc.), and Stephen O'Connell (Senior Vice President and Treasurer for both Navient Corporation and Navient Solutions, Inc.).

31.    In public statements, including annual 10-K filings with the U.S. Securities and Exchange Commission, Navient Corporation (and its predecessor Sallie Mae) has boasted about its capabilities with respect to student loan servicing and collection, including help to consumers navigating the path towards financial success and selecting the appropriate payment plan for their circumstances. Navient Corporation has also indicated that it is responsible for overseeing the strategic direction and business goals of its subsidiaries, which includes Navient Solutions, Inc. For instance, Navient Corporation's 2015 10-K filing includes the following statements:

a.    "Navient [Corporation] services loans for more than 12 million … customers, including 6.3 million customers whose accounts are serviced under Navient [Corporation]'s contract with [the Education Department]. We help our

customers navigate the path to financial success through proactive outreach and emphasis on identifying the payment plan that best fits their individual budgets and financial goals."[14]

b.      "The Navient [Corporation] board of directors and its standing committees oversee our strategic direction, including setting our risk management philosophy, tolerance and parameters; and establishing procedures for assessing the risks our businesses face as well as the risk management practices our management team develops and implements."[15]

c.      "Each business area within our organization is primarily responsible for managing its specific risks following processes and procedures developed in collaboration with our executive management team and internal risk management partners."[16]

32.      Navient Solutions, Inc., and its predecessor Sallie Mae have a long history of questionable practices as loan servicers and loan providers:[17]

a.      In 2014, Navient paid $60 million to settle an investigation by the Justice Department and the Federal Deposit Insurance Corporation, alleging that the company had been wrongly overcharging military families for almost a decade.

---

[14] CFPB Complaint, at ¶ 23.
[15] Id.
[16] Id.
[17] Gretchen Morgenson, At Student Loan Giant Navient, Troubled Past Was Prologue, NY Times (Jan. 21, 2017), https://www.nytimes.com/2017/01/21/business/navient-sallie-maestudent-loans.html

b.      In 2009, the Education Department investigated Sallie Mae, Navient's predecessor, for overcharging the government by $22.3 million by abusing a program meant for small lending.

c.      In 2008, the Federal Deposit Insurance Corporation and the Utah Department of Financial Institutions issued a cease-and-desist order against Sallie Mae Bank, a subsidiary of Sallie Mae, for unfair and deceptive practices and violating laws intended to protect borrowers from discrimination.

33.     This Complaint, along with Complaints filed by the Illinois Attorney General[18], Washington Attorney General[19], and the Consumer Financial Protection Bureau ("CFPB")[20] is another in the line of those alleging Navient's mismanagement. In addition, the Attorneys General of twenty-two states recently wrote a letter to Betsy DeVos, Secretary of the Department of Educations, raising concerns about Navient's "widespread abuses of student borrowers."[21]

## **FACTS**

### *The Student Loan Crisis*

34.     Completing a four-year degree at a college or university is becoming

---

[18] See Complaint filed by the Illinois Attorney General, 17-CH-0761, ECF 1 (Ill. Cir. Ct. Mar 23, 2017) [hereinafter, "Illinois AG Complaint"].

[19] See Complaint filed by the Washington Attorney General, (Wash. Dist. Ct. Mar 23, 2017) [hereinafter, "Washington AG Complaint"].

[20] See Complaint filed by CFPB, 17-cv-0101, ECF 1 at 10 (M.D. Pa., Jan. 18, 2017) [hereinafter, "CFPB Complaint"].

[21] Letter to Betsy DeVos, Secretary of the Department of Education, from Maura Healey, Massachusetts Attorney General, et al., Re: Revocation of Student Loan Borrower Protections (Apr. 24, 2017), http://www.mass.gov/ago/docs/press/2017/multistate-letter-to-sec-devos.pdf

increasingly necessary to compete for well-paying jobs in the current economy.

35.     As of 2013, employees between the ages of 25 and 32 with at least a Bachelor's degree received an average annual salary of $45,000, around $15,000 more per year than employees who received only a two-year degree (averaging $30,000 per year) or graduated from high school (averaging $28,000 per year).[22]

36.     Since 1979, the average annual salaries of employees with only a two-year degree or a high school education has decreased by approximately $5,000 and $4,000 respectively, while the value of four year degree has increased by almost $5,000 per year.[23]

37.     While the benefit of a four-year degree has increased, so has the cost of obtaining one.

38.     The average yearly tuition for a four-year institution has more than doubled since 1984-85, rising from approximately $11,548 to $25,409 in 2014-15. From 2004-05 to 2014-15 alone, yearly tuition rates for four-year public institutions increased over 33 percent.[24] In 2015- 16, average tuition and fees at a public four-year college or university – which is, on average, the least expensive type of four-year institution – had increased by 13 percent from 2010-2011, a significantly higher

---

[22] The 7 Benefits of Going to College, ED Smart (last visited, Jun. 28, 2017), http://www.edsmart.org/7-benefits-of-college-degree/
[23] Id.
[24] Fast Facts: Tuition Costs of Colleges and Universities, NCES (last visited, Jun. 28, 2017), https://nces.ed.gov/fastfacts/display.asp?id=76

increase than inflation or wage growth in the same period.[25]

39.     With rising tuition costs, "[f]inancial aid has become a fundamental expectation of students and institutions."[26] Since 2005, the number of student loan borrowers has almost doubled, from 23 million to approximately 44 million.23 By 2012, nearly 75% of all students graduating from a four-year institution graduated with student loan debt—translating to 1.3 million students, up from 1.1 million in 2008 and 0.9 million in 2004.[27]

40.     Simply put, most current and future students could not afford the cost of obtaining a four-year degree without receiving public and/or private student loans.

41.     As the cost of obtaining a four-year degree has skyrocketed, student loan debt has spiraled out of control. In all, nearly half of Americans starting their working lives do so with student debt resulting in more than double the number of Americans with student debt from a decade ago.[28]

42.     Federal Student Aid reports the average debt for a single year of college is $6,707 and, by the completion of a four-year degree, students average $26,830 in debt.[29]   For non-public schools, the numbers are more concerning. In 2012, 75

---

[25]  Lusardi, Annamaria, et al., Student Loan Debt in the US: An Analysis of the 2015 NFCS Data, GFLEC (Nov 2016), http://gflec.org/wp-content/uploads/2016/11/GFLEC-Brief-Student-loandebt.pdf
[26] Matthew B. Fuller, A History of Financial Aid to Students, 44 J. Student Fin. Aid 42, 42 (2014).
[27]    Quick  Facts  About  Student  Debt,  Institute  for  College  Access  &  Success  (2014), http://ticas.org/sites/default/files/pub_files/Debt_Facts_and_Sources.pdf.
[28] Press Release, Study finds 1 in 3 student loan holders with payments due are late with payment, FINRA (Nov. 14, 2016) .
[29]    Entrance   Counseling,   Federal   Student   Aid   (last   visited,   Jan.   28,   2017), https://studentloans.gov/myDirectLoan/entranceCounseling.action?execution=e1s1.

percent of graduates from private nonprofit schools had student loan debt with an average indebtedness of $32,300 per person. By comparison, 88 percent of graduates from for-profit colleges took out student loans with an average indebtedness of $39,950 per person.[30]

43.     Student loan indebtedness affects more than just young workers and recent graduates. In 2015, older consumers often looking to cover the substantial costs of student loans for their children or grandchildren owed an estimated $66.7 billion in student loans[31] In fact, the number of consumers age 60 and older with outstanding student loan debt has quadrupled since 2005, growing from 700,000 to 2.8 million borrowers and cosigners.[32]

44.     The rising costs of tuition and growing student loan debt has led to staggering milestones for overall student loan debt in the United States. Student loan debt has been one of the fastest growing forms of debt over the past decade. In 2010, student loan debt exceeded credit card debt and, by 2011, student loan debt had surpassed auto loan debt making student loan debt the second largest debt market in the United States. In 2012, student loan debt passed the $1 trillion mark and continues to grow.[33]

45.     In all, approximately 44 million student loan borrowers currently owe

[30] Student Loan Debt Statistics, supra note 3.
[31] Snapshot of Older Consumers and Student Loan Debt, CFPB at 2 (Jan. 2017).
[32] Id. at 4
[33] Mark Kantrowitz, Why the Student Loan Crisis is Even Worse than People Think, CNN Money (Jan 11, 2016).

around $1.4 trillion in student debt.

46.     The significant number of borrowers in debt and the substantial amount of debt owed has predictably caused complications for some borrowers in loan repayment. A staggering 37% of student loan holders have reported being late on a student loan payment at least once in the past 12 months, and about half of student loan holders are concerned about their ability to pay off their student debt.[34]

47.     The Consumer Federation of America similarly found that millions of borrowers failed to make a loan payment for at least nine months or more in 2016 on debt worth $137 billion in federal student loans. Similarly, in September 2014, around one in seven borrowers had defaulted on their loans within 3 years of starting repayment, which amounted to $103 billion worth of debt.[35] These numbers indicate about 10 percent of debt is regularly in default and not being paid back.

48.     Both younger and older borrowers have experienced increased delinquency rates on their student loans. The student loan delinquency rate, defined as loans in delinquent or default for 90 days or more, on student loans is at an estimated 11.2 percent.[36]  Like younger borrowers, older borrowers have seen increasing delinquency rates rise from 7.4 percent in 2005 to 12.5 percent in 2012.[37]

---

[34] Study finds 1 in 3 Students Late, supra note 25.
[35] Federal Student Loans Education Could Do More to Help Ensure Borrowers Are Aware of Repayment and Forgiveness Options, Gov't Accountability Office (Aug. 2015).
[36] Student Loan Debt Statistics, supra note 3.
[37] Snapshot of Older Consumers and Student Loan Debt, supra note 28, at 11.

Incredibly, nearly 40 percent of federal student loan borrowers age 65 and older are in default.[38]

49.     Although the number of defaults and repayment concerns, the federal government has adopted a litany of repayment programs specifically designed to adjust repayment based on income and permit borrowers to consistently make affordable payments on their loans.

***Federal Student loan Repayment Options***

50.     The federal government has prioritized financial assistance to students for higher education since 1965, when Congress passed the Higher Education Act, Title IV. The Act has experienced significant modifications since then, but the objective remains the same: provide a competitive advantage in the global economy by creating a highly-skilled work force and ensure that low-income, middle-income, and minorities have access to quality higher education.

51.     Until 1994, the federal student loans were almost entirely funded by private lenders, with funds insured by guaranty agencies and in turn, reinsured by the federal government. However, in 1994, President Clinton signed the Student Loan Reform Act which sought to convert 60 percent of federally guaranteed student loans to direct loans – loans the federal government provided directly to borrowers

---

[38] Id.

– over a five year period.[39]

52.    The transition from private loans to direct federal loans was completed by the passage of the Health Care and Education Reconciliation Act in 2010. The 2010 Act eliminated the Federal Family Education Loan Program – through which, the Federal Government backed private student loans – and replaced it with the Direct Student Loan Program – whereby the federal government provides direct student loans. Today, a majority of student loans are Direct Loans offered by the federal government.

53.    For borrowers, federal student loans have significant benefits as compared to private loans, including:

a.    Deferment. Federal loans often require borrowers to make no payments until the borrower has graduated or left full-time student status while private loans may require payments while the borrower is still in school.[40]

b.    Interest rates. Federal loans often have lower and fixed interest rates while private loans often have variable interest rates that can exceed 18 percent.

c.    Subsidized loans. Some students qualify for subsidized loans through which the government pays the interest on the loan while the borrower is in school which is unavailable for private loans.

---

[39] Fuller, supra note 22, at 57.
[40] Federal Versus Private Loans, Federal Student Aid (last visited, Jun. 28, 2017), https://studentaid.ed.gov/sa/types/loans/federal-vs-private

d.      Credit and Cosigners. Federal loans often do not examine borrowers' credit scores or require cosigners to obtain a loan while private loans may require established credit and often require a cosigner.

e.      Tax deductible interest. Interest on federal student loans may be tax deductible which is not usually available for private student loans.

f.      Consolidation. The federal government offers a Direct Consolidation Loan which permits borrowers to consolidate all of their federal loans into a single, low interest loan.

g.      Income-Driven Repayment Options. The Federal Government provides numerous repayment options that adjust to borrowers' incomes and provide relief in both temporary and long-term financial distress.

54.     After the passage of the Healthcare and Education Reconciliation Act of 2010, the federal government has become by far the most prominent source of student aid. The Federal Government has amassed $1.291 trillion in debt spread across 42.3 million borrowers, accounting for over 90 percent of all student debt.[41]

55.     To service its direct federal student loans, the U.S. Department of Education contracts with financial companies, including Navient, to provide "any potential services to manage all types of Title IV student aid obligations, including,

[41] A Look at the Shocking Student Loan Debt Statistics for 2017 supra note 3.

but not limited to, servicing and consolidation of outstanding debt."[42]

56.    The Federal government heavily relies on servicers to educate borrowers about their repayment options and, where appropriate, offer individual assessments of borrowers' financial circumstances to determine the best repayment options. While federal student loan borrowers are usually assigned to or select a specific repayment plan at the start of repayment, repayment plans are not locked-in. Rather, borrowers can alter their repayment plans depending on their financial circumstances.

57.    Repayment options include a standard repayment plan where payments are fixed for a ten year period, graduated repayment plans where payments increase over time, extended repayment plans which last twenty-five years rather than ten years, Pay as You Earn Repayment (PAYE) and Revised Pay As You Earn (REPAYE) where monthly payments are limited to ten percent of a borrower's discretionary income, and Income-Driven Repayment plans where monthly payments are calculated as a percentage of discretionary or annual income.[43]

58.    Income-Driven Repayment ("IDR") plans, including PAYE and income-based repayment, are repayment plans specifically designed to help borrowers manage their student loan debt and continue to make affordable payments,

---

[42] See Servicing Contract, CFPB Complaint, ECF 29-1.
[43] Repayment Plans, Federal Student Aid (last visited, Jun. 28, 2017), https://studentaid.ed.gov/sa/repay-loans/understand/plans

even when a borrower is experiencing financial hardship or distress. Borrowers with a high debt relative to income and who are unable to make monthly payments at the ten-year standard plan amount may qualify for an IDR plan. For those borrowers, IDR permits monthly payments of 10-15 percent of discretionary income, recalculated each year based on updated income and family size. Some borrowers are eligible to pay $0 per month on an IDR plan.

59.     IDR plans are designed for borrowers experiencing long-term financial hardship. For borrowers with subsidized loans (student loans for which the government pays off any interest), the government will pay any remaining unpaid interest that accrues after the borrower's monthly payment through the IDR plan for the first three years of repayment. Thus, while the borrower is making his or her IDR plan payments, excess interest is not added to the principal balance of the loan, reducing the amount repaid over the life of the loan.

60.     Additionally, after 20 to 25 years of monthly IDR plan payments, any outstanding balance on the loan will be forgiven.[44]

61.     Federal student loans also generally offer options for student loan borrowers temporarily struggling to pay their monthly student loan payment. For example, forbearance allows borrowers to temporarily stop making their student

---

[44] Income-Driven Plans, Federal Student Aid (last visited, Jun. 28, 2017), https://studentaid.ed.gov/sa/repay-loans/understand/plans/income-driven.

loan payments, avoiding default. The federal Student Aid Office advises that forbearance is available for borrowers "struggling to repay . . . loans due to a temporary circumstance." Forbearance is appropriate for borrowers who are "temporarily unable to make . . . scheduled monthly loan payments" because of "financial difficulties[,] medical expenses[,] change in employment[, or] other reasons acceptable to your loan servicer[.]"[45]

62.    Over the long-term, however, forbearance can negatively affect borrowers' student loan accounts. While a student loan is in forbearance, unpaid interest accumulates and is added to the principal balance of the loan. The higher principal can increase the amount of monthly interest and, eventually, lead to higher monthly loan payments when forbearance is ended. Forbearance continued over a long period of time may significantly increase the principal balance on the loan.

63.    For that reason, the Student Aid Office recommends that borrowers "having trouble repaying . . . loans due to circumstances that may continue for an extended period, or [who are] unsure when [they] will be able to afford to make . . . monthly loan payments again . . . consider an income-driven repayment plan." The Student Aid Office recommends borrowers contact their "servicer immediately" to discuss their options.

---

[45] Deferment or Forbearance, Federal Student Aid (last visited, Jun. 28, 2017), https://studentaid.ed.gov/sa/repay-loans/deferment-forbearance

64.     The application process for IDR programs and forbearance differs significantly. Federal loan servicers are permitted to determine when a borrower may be entered into forbearance and does not need prior approval from the Student Aid Office.

65.     IDR, by contrast, is available only for eligible borrowers who must apply with the Student Aid Office and submit documentation supporting the borrower's eligibility for IDR programs.

66.     Given the complexity and variety of IDR programs, the Student Aid Office encourages borrowers to work with their loan servicers to learn about, determine eligibility, and apply for IDR programs:

a.     "Why pay for help with your federal student loans when your loan servicer will help you for FREE? Contact your servicer to apply for income-driven repayment plans, student loan forgiveness, and more."[46]

b.     "Before you apply for an income-driven repayment plan, contact your loan servicer if you have any questions. Your loan servicer will help you decide whether one of these plans is right for you."[47]

c.     "To apply, you must submit an application called the Income-Driven Repayment Plan Request . . . The application allows you to select an income-driven

---

[46] Income-Driven Plans, Federal Student Aid (last visited, Jun. 28, 2017), https://studentaid.ed.gov/sa/repay-loans/understand/plans/income-driven.
[47] Id.

repayment plan by name, or to request that your loan servicer determine what income-driven plan or plans you qualify for, and to place you on the income-driven plan with the lowest monthly payment amount."[48]

67.    The forms borrowers must complete to apply for IDR plans also informs borrowers to discuss IDR plan options with their loan servicer: "If you need help with this form, contact your loan holder or servicer for free assistance."[49]

68.    Making servicers available to borrowers to discuss IDR repayment options is an important objective for the federal government because some organizations will offer these services for a fee. For example, the Student Aid Office website informs borrowers "You Don't Have To Pay for Help With Your Student Loans[,]" directing borrowers to "take care of yourself for free by contacting your loan servicer" for help with a variety of services including, to "[c]hange your repayment plan" and "postpone monthly payments while you're furthering your education or are unemployed."[50]

69.    Loan servicers contracting with the federal government likewise warn borrowers about paying for services they provide without a fee. Navient's website warns borrowers to "Beware of Offers for Debt Relief" where "companies claim

---

[48] Id.
[49] A copy of the Income-Driven Repayment (IDR) Plan Request form can be found at: https://static.studentloans.gov/images/idrPreview.pdf
[50] Avoid Scams, Federal Student Aid (last visited, Jun. 28, 2017), https://studentaid.ed.gov/sa/types/scams#dont-pay-for-help

they can reduce or eliminate your debt, but they charge for services we offer for free."[51] Nelnet, another loan servicer, states in bold: "Never Pay for Student Loan Help. It's Available for Free from Your Student Loan Servicer!"[52] Great Lakes, also a loan servicer, advises borrowers "Don't Pay a Fee for Student Loan Help That's Free."[53] When loan servicers fail to provide the free assistance they offer and the federal government asserts they provide, borrowers are at an increased risk of falling into third-party fee-based services and possibly fraudulent scams intended to take advantage of the vulnerable class of financially-stressed borrowers.[54]

### *Navient, a Federal Student Loan Provider*

70.     Navient is the nation's largest student loan servicer, handling more than 1 in 4 accounts[55] related to loans for higher education including servicing Department of Education student loans. Navient bills itself as a "loan management, servicing and asset recovery company, committed to helping customers navigate the path to financial success." Navient "services loans for more than 12 million . . . customers, including 6.3 million customers whose accounts are serviced under

---

[51] Customers, Navient (last visited, Jun. 28, 2017), https://www.navient.com/loancustomers/

[52] Never Pay for Student Loan Help, Nelnet (last visited, Jun. 28, 2017), https://www.nelnet.com/third-party-servicer-fraud

[53] Free Help, Great Lakes (last visited, Jun. 28, 2017), https://www.mygreatlakes.org/educate/knowledge-center/free-services.html

[54] See, e.g., Kevin McCoy, Feds Halt Alleged Student Loan Debt Relief Scam, USA Today (May 25, 2017), https://www.usatoday.com/story/money/2017/05/25/feds-halt-alleged-student-loandebt-relief-scam/102144638/ & Herb Weisbaum, As Student Loan Defaults increase, So Do the Scams, NBC News (Sep. 19, 2016), http://www.nbcnews.com/business/consumer/studentloan-defaults-increase-so-do-scams-n650466

[55] Shahien Nasiripour & Janet Lorin, Behind the Dizzying Student Loan Game Navient Allegedly Played, Bloomberg (Jan. 26, 2017), https://www.bloomberg.com/news/articles/2017-01- 26/behind-the-dizzying-student-loan-game-navient-allegedly-played.

Navient [Corporation]'s contract with [the Department of Education]."

71.    Navient claims to "help [their] customers navigate the path to financial success through proactive outreach and emphasis on identifying the payment plan that best fits their individual budgets and financial goals."[56] Navient, at least publicly, proclaims the important role of servicers as educators and advisors available to assist borrowers in understanding and applying for repayment plans:

a.    "For some borrowers, student loan debt can be especially daunting. The good news is that borrowers can turn to their student loan servicers for help to navigate the complex repayment options."[57]

b.    "A recent analysis of the top factors of student loan success showed that borrowers who stay connected with their servicer are more likely to make progress in loan repayment. As a servicer, we've found that nine times out of 10, when we reach struggling federal loan borrowers we are able to help them avoid default by getting them into a repayment plan that works for them. Contact works; let's encourage it."[58]

c.    "Making your student loan payments is an important part of managing your finances, but there may be life circumstances that make it difficult to meet these

---

[56] See CFPB Complaint at ¶ 10.
[57] Jack Remondi, 4 Ideas For a Better Student Loan Program, Medium (Feb. 12, 2017), https://medium.com/@JackRemondi/4-ideas-for-a-better-student-loan-program-a-commonsense-recipe-for-reform-521e651d612
[58] Jack Remondi, Smarter Student Loans: A Game Plan (Oct. 6, 2015), http://www.politico.com/agenda/story/2015/10/smarter-student-loans-a-game-plan-000267

obligations. It is good to know that your loan servicer may be able to offer you options designed to help you stay current on your loan payments, in a way that works for you financially . . . To explore different types of repayment plans and the option that best fits your needs, you can . . . call your loan servicer."[59]

d.    "Struggling federal borrowers who engage with their servicers will learn about the options to repay student loans in a way that best fits their individual circumstances. Income-driven repayment programs such as Pay As You Earn and Income-Based Repayment establish a monthly payment based on a percentage of discretionary income that can make short- or long-term financial challenges much more manageable."[60]

72.    Navient was also well aware of the importance of servicers in helping borrowers make timely payments and adjust repayment plans accordingly. For example, Navient CEO Jack Remondi explained: "Under the Obama Administration, enrollment in [income-based repayment] programs has increased dramatically, and today one in four borrowers is in an IDR plan. Despite this success, the proliferation of plan options and increasing complexity in the system has created barriers for borrowers who could benefit from these programs."[61]

---

[59]    Video, Choosing Your Repayment Plan, Navient (last visited, Jun. 28, 2017), https://www.navientpath.com/navientpath/curriculum/show?enrollment_id=15802651&part=1& signup=1#navient-income-driven-repayment/choosing-your-repayment-plans

[60]Jack Remondi, It's Time to Put Students First, Medium (May 23, 2016), https://medium.com/@JackRemondi/its-time-to-put-students-first-7cd578ca266e)

[61] Jack Remondi, 56 Federal Student Loan Repayment Options? We Can and Should Do Better, Medium (Oct. 12, 2016),    https://medium.com/@JackRemondi/56-federal-student-loanrepayment-options-we-can-and-should-

73.    Remondi has also indicated the four most important areas in need of improvement to benefit student loan borrowers are "Educating borrowers[,]" "Simplifying repayment[,]" "Helping borrowers pay off early rather than delay[,]" and "Encouraging borrowers to engage with their loan services."[62]

74.    Navient's own research proffered further evidence that borrowers rely on servicers to provide information about and assist borrowers with IDR repayment options. In 2015, Navient implemented an "education campaign on income-based repayment, and developed research-based communications to assist customers facing financial difficulty."[63] As part of that campaign, Navient conducted a survey of borrowers enrolled in IDR and PAYE plans.[64]

75.    Nearly all of the borrowers Navient surveyed indicated that IDR was "very important" or "essential" and that "a repayment plan based on my income has helped me better manage my student loan debt."[65]

76.    Significantly, in response to a question about "[w]hat is needed to make [a] decision on future plans for IDR, 55 percent of survey takers stated they needed "[i]information on how [IDR] impacts my total loan cost" and 65 percent stated they

_____

simplify-1e8cb6eb

[62]  Jack Remondi, Smarter Student Loans: A Game Plan, Politico (Oct. 6, 2015), http://www.politico.com/agenda/story/2015/10/smarter-student-loans-a-game-plan-000267

[63]  Press Release, Navient Debuts Services to 12 Million Student Loan Customers, Globe Newswire (Oct. 13, 2014), http://news.navient.com/releasedetail.cfm?releaseid=875837

[64]  Income-Driven Repayment and Student Loan Affordability, Navient (2015), https://www.navient.com/assets/about/who-we-are/Income-Driven-Repayment-and-StudentLoan-Affordability-Study.pdf.

[65]  Id. at 5

Case 6:22-cv-02304-WWB-DCI    Document 1    Filed 12/12/22    Page 32 of 50 PageID 32

needed "[a]dvice on whether this is the right type of plan for me." More than half of survey takers "agreed with the statement that repayment plan options for student loans are very confusing."[66]

77.    Navient even successfully identified short-cut identifiers for borrowers who may be eligible for IDR. For example, 75% of IDR-enrolled borrowers made less than $50,000 annually with nearly half of borrowers in IDR plans making less than $35,000. Similarly, almost 90 percent of enrollees were working full time; 90 percent successfully completed their degrees; 40 percent attended graduate school and obtained a graduate degree; and half were younger than 34 years old.[67]

78.    Navient's repeated findings concerning the substantial benefit that IDR provides borrowers facing financial difficulty and borrowers' overall lack of awareness and understanding of IDR plans prompted Navient to consistently encourage borrowers to contact it for IDR-related assistance:

a.    "[Navient is] committed to giving you the information and tools you need to understand and evaluate your student loan payment options. We can help you find an option that fits your budget, simplifies payment, and minimizes your total interest cost."[68]

b.    "[I]f you're having trouble, there are options for assistance, including

---

[66] Id. at 6
[67] Id. at 2
[68] CFPB Complaint at ¶ 39.

income driven repayment plans, deferment, forbearance, and solutions to help you avoid delinquency and prevent default . . . We can work with you to help you get back on track, and are sometimes able to offer new or temporarily reduced payment schedules. Contact us at 800-722-1300 and let us help you make the right decision for your situation."[69]

c.     "If you're experiencing problems making your loan payments, please contact us. Our representatives can help you by identifying options and solutions, so you can make the right decision for your situation."[70]

d.     "Navient is here to help. We've found that, 9 times out of 10, when we can talk to a struggling federal loan customer we can help him or her get on an affordable payment plan and avoid default."[71]

e.     "If [y]ou're [h]aving [t]rouble . . . [l]ook for alternative repayment options. Contact Navient and your other loan services. We can work with you to help you get back on track, and are sometimes able to offer new or temporarily reduced payment schedules. Contact us . . . and let us help you make the right decision for your situation."[72]

f.     "At Navient, we make it a priority to educate our federal borrowers

---

[69] Id. at ¶ 38.

[70] Id.

[71] Id.

[72] You're Having Trouble, Navient (last visited, Jun. 28, 2017), https://www.navient.com/loancustomers/postponing-payments/if-you-are-having-trouble/.

about incomedriven options, with more than 170 million communications annually about repayment options. These programs are our primary tool in helping borrowers avoid default. As a result, we are a leader in enrolling borrowers in these programs."[73]

g.    "At Navient, we use our experience and data to create highly effective tools that assist our customers as they navigate the path to repayment."[74]

79.    Navient describes its federal student loan servicing practice as: "help[ing] . . . customers successfully pay their education loans and build their credit . . . [using] financial literacy tools and in-depth customer service" and achieving "positive results in keeping borrowers on the path to successful repayment."[75]

80.    Although Navient advertises its ability to assist borrowers with loan repayment and delinquency avoidance, it is also Navient's responsibility to do so. According to the Servicing Agreement Navient signed with the Department of Education, Navient is responsible for "any potential services to manage all types of Title IV student aid obligations, including, but not limited to, servicing and consolidation of outstanding debt" and must provide "default aversion activity on loans serviced . . . on the servicer's system."

---

[73] Jack Remondi, It's Time To Put Students First, Medium (May 23, 2016), https://medium.com/@JackRemondi/its-time-to-put-students-first-7cd578ca266e
[74] Stephanie Eidelman, Navient CEO Shares Rarely Heard Stores about Student Debt Payment, Inside Arm (May 31, 2016), https://www.insidearm.com/news/00041966-navient-ceo-sharesrarely-heard-stories-a/.
[75] Services, Navient (last visited, Jun. 28, 2017), https://www.navient.com/about/who-weare/services/

81.    The Department of Education also informs borrowers through the Master Promissory Note ("MPN") of the responsibility of servicers. The MPN is a "legal document in which [the borrower] promise[s] to repay [the borrowers] loan(s) and any accrued interest and fees to the U.S. Department of Education. It also explains the terms and conditions of [the borrowers] loan(s)." Borrowers must attest that they "understand that ED may use a servicer to handle billing and other communications related to the[] loan."

82.    In 2014, the MPN informed borrowers that "Direct Loans are made by the U.S. Department of Education. We contract with servicers to process Direct Loan payments, deferment and forbearance requests, and other transactions, and to answer questions about Direct Loans." The 2011 and 2014 versions of the MPN both provide information about the types of repayment plans, including IDR plans. The MPNs state "You may change repayment plans at any time after you have begun repaying your loan. There is no penalty if you make loan payments before they are due, or pay more than the amount due each month." The Department of Education encourages borrowers to contact their servicers about these issues: "We will provide you with the address and telephone number of the Loan Servicing Center after your school notifies us that the first disbursement of your loan has been made."

83.    The Education Department has prioritized educating borrowers about IDR plans. The Department found 51 percent of Direct Loan borrowers were eligible

for Income-Based Repayment but, by 2014, only 13 percent were participating with an additional 2 percent in PAYE plans.[76] The Department also found deficiencies in borrowers' awareness and understanding of these plans and that servicers had constantly failed to educate borrowers about the plans. Similar studies have shown only one in five students are aware that student loan payments may be adjusted to their income.[77] By encouraging borrowers to work with their servicers, the Education Department sought to educate about and assist borrowers with IDR plans.

84.    Ensuring borrowers have information on and the ability to choose repayment plans is critical to enabling borrowers to successfully and continuously make payments on their federal student loan accounts. Navient's own survey of over 12,000 student loan borrowers enrolled in IBR or PAYE led to the conclusion that income-driven repayment programs were "largely serving [their] purpose to provide relief for low-to-moderate-income individuals making the transition from school to repayment."

***Navient Breached its Obligation to Assist Borrowers in choosing the Best Repayment Plan***

85.    Although Navient has encouraged borrowers to contact it for assistance in choosing the best repayment plan, Navient has not reasonably assisted those borrowers who have reached out for help. Instead of performing individual analyses

---

[76] Federal Student Loans Education Could Do More to Help Ensure Borrowers Are Aware of Repayment and Forgiveness Options, supra note 32.
[77] Lusardi, Annamaria, supra note 21.

to determine IDR eligibility and assist in IDR applications, Navient has persistently steered borrowers towards forbearance, even when borrowers were experiencing the type of long-term financial hardship that continual forbearance compounds, and that other programs like IDR and PAYE may benefit.

86.    Navient prefers putting borrowers into forbearance rather than into an IDR plan for one simple reason: making more money for Navient. As CEO Jack Remondi admitted, "it's very expensive work, for example, to enroll a borrower into something like an income-based repayment program . . . which we are doing. But we don't actually get paid for outperformance in that side of the equation."[78]

87.    Similarly, Steven McGarry, chief financial officer at Sallie Mae and Senior Vice President of Sallie Mae before Navient was formed through corporate reorganization, said in January 2017: "Student loan servicing is a low-margin, high-volume business: It doesn't cost much to service an account for a borrower who pays automatically through her bank account. For those who are late on their payments, however, a servicer can rack up expenses that are many, many multiples of the average servicing costs."[79]

88.    To avoid the time and expense of servicing difficult loans, Navient implemented incentives designed to limit the length of conversations about and

---

[78] Nasiripour & Lorin, supra note 52.
[79] Id. (internal quotations omitted).

involvement in assisting borrowers with their repayment options. Navient compensated its customer service representatives, in part, on the shortness of their average call time. Such a compensation program discourages customer sales representatives from discussing IDR plans and encourages them simply to place borrowers into forbearance, which takes much less time and expense for the servicer.

89.    Unlike forbearance, IDR and PAYE require additional time and effort for borrowers to apply. First, borrowers rely on Navient to learn about and obtain information regarding IDR plans as compared to other repayment plans and forbearance; thus, Navient's consumer representatives must commit to lengthy and detailed conversations with borrowers about their repayment options. Second, more than half of Navient's borrowers enrolling into IDR plans reported they could not navigate the process on their own; meaning, borrowers rely on servicers like Navient to determine eligibility and complete the application process. Third, to enroll in IDR, borrowers must complete a paper or online application and must include documents related to their income; Navient's customer representatives must endure sometimes multiple conversations with a borrower to complete this process. Finally, IDR plans require borrowers to complete annual recertification forms each year. In the recertification, borrowers must provide information related to current income and family size, which may lead to adjustments in the monthly payment amount.

90.    Forbearance, by contrast, requires no formal application, much less

explanation, and no annual recertification forms. Placing a borrower into forbearance is far easier and more efficient for Navient; however, it is rarely the best option for borrowers struggling to make their monthly payments.

91.    The effect of Navient's strategy to minimize its servicing of federal student loan borrowers was to essentially force borrowers into forbearance, even when clearly inappropriate given the borrowers' financial circumstances. A review of call records between Navient and federal student loan borrowers by investigators demonstrated that forbearance and deferment were frequently mentioned with the first six minutes of the call, while IDR plans were mentioned far less frequently. In fact, around half the time, Navient employees never mentioned IDR plans at all.[80]

92.    One former Navient loan servicing specialist working in Newark, Delaware from 2011-2012 explained the effect of Navient's compensation program. According to her, the maximum call time to receive a bonus was approximately six minutes. Her call times, however, were often about ten minutes because she tried to see if callers qualified for lower payments. She observed other customer service representatives who hung up on customers or had short call times would make bonuses. She states that she often got pulled aside and talked to because of her higher call times.[81] As the former employee explained, Navient's incentive compensation

---

[80] Nasiripour & Lorin, supra note 52.
[81] Washington AG Complaint ¶ 5.159.

structure incentivized and actually impacted Navient's employee's call times with borrowers, diminishing the quality of service borrowers received.

93.     The following line graph represents a sample of average call times during which Navient mentions income-driven repayment options, deferment, and forbearance with callers.[82] The top line represents the instances in which Navient customer sales representatives mention only deferment or forbearance. The line below represents instances in which Navient's customer sales representatives mention other repayment options, including IDR.



94.     As the graph demonstrates, Navient's customer sales representatives discuss forbearance and deferment at a far greater rate than other repayment options.

_____

[82] This graph was created by the Illinois Attorney General's Office, who reviewed phone calls during the course of their investigation of Navient's compensation policies which resulted in shorter call times and failures to explain more complicated repayment programs like IDR. See Illinois AG complaint, at ¶¶ 273-77.

Between 3 to 6 minutes, customer sales representatives mention only deferment or forbearance upwards of four times more often than they mention any other repayment options.

95.     The graph further lends credence to the former Navient employee, who stated that bonuses are based on having calls less than approximately six minutes. Customer sales representatives mention only deferment and/or forbearance at a significantly higher rate before the six-minute mark. After six minutes, the number of calls where customer sales representatives mention only forbearance and/or deferment deceases and the number of calls where customer sales representatives mention other repayment options increases.

96.     Navient's lack of meaningful engagement with student loan borrowers has built up frustration among student loan holders. From January to March 2017, student loan complaints about Navient made to the CFPB drastically increased. In comparison to the same period in 2016, complaints were up by 325 percent. Borrowers further confirmed in the complaints to the CFPB that when contacting Navient regarding financial distress, they were provided information on forbearance or deferment rather than IDR or other repayment options.

97.     Navient has enrolled significantly more borrowers in forbearance than in IDR plans. For example, in December 2010, approximately 9% of borrowers with a loan through Federal Family Education Loan (FFEL) serviced by Navient were

enrolled into voluntary forbearance, while less than 1 percent of borrowers were enrolled in IBR. Likewise, in December 2012, approximately 7 percent of borrowers with a FFEL loan serviced by Navient were enrolled in voluntary forbearance, while only 2% of borrowers were enrolled in IBR.

98.     Between January 1, 2010 and March 31, 2015, nearly 26 percent of borrowers serviced by Navient who ultimately enrolled in IDR programs with a $0 monthly payment were enrolled in voluntary forbearance within the twelve-month period immediately preceding their enrollment in IDR.[83] Within that same period, 16 percent of borrowers who enrolled in PAYE were placed into forbearance within the twelve-month period immediately preceding their PAYE enrollment.[84]

99.     At the same time, Navient enrolled over 1.5 million borrowers nationwide in two or more consecutive forbearances totaling twelve months or longer. More than 470,000 of these borrowers were enrolled in three consecutive forbearances, and more than 520,000 of them were enrolled in four or more consecutive forbearances.[85]

100.    Many of the borrowers placed in forbearance qualified for an IDR plan. In fact, over 50 percent of Navient borrowers who need payment relief and meet the eligibility criteria for IDR plans would qualify for a monthly payment of $0.

---

[83] Illinois AG Complaint, at ¶ 285.
[84] Id. at ¶ 286.
[85] Id. at ¶ 290

101.    Navient's unwillingness to engage with struggling borrowers has caused substantial problems for these borrowers, snowballing their debt out of meaningful control, ruining their credit scores and burdening their lives with the risk of financial ruin. While Navient's forced-forbearance strategy was effective in saving Navient money, it cost borrowers substantially. Indeed, the CFPB estimates Navient's actions helped increase the total debt by $4 billion.

102.    A recent Reuters investigative piece detailed but a few examples of the borrowers impacted by Navient's practices.[86]

103.    While borrowers were driven into forbearance, and ultimately harmed, Navient benefited. Navient saved considerable time and money by avoiding detailed conversations with borrowers about IDR and PAYE, limiting the number of IDR applications it completed, and reducing the number of borrowers in need of annual reminders and assistance related to recertification forms. By simply pushing borrowers into forbearance, Navient was able to reduce its customer service personnel and the time and expense of dealing with the "expensive" group borrowers who are struggling to make their payments and in need of IDR programs in which they are entitled to participate by federal law.

104.    Navient has sharply changed its tune now that its strategy has been

---

[86] Michelle Conlin, Student Loan Borrowers, Herded Into Default, Face a Relentless Collector: The U.S., Reuters (July 25, 2017), https://www.reuters.com/investigates/special-report/usastudentloans

made public. Despite once boasting about its ability to help borrowers navigate toward repayment success, Navient now claims "[b]orrowers cannot reasonably rely on a loan servicer to serve as a fiduciary" and "could not reasonably rely on Navient to counsel them into alternative payment plans."[87]

105.   Navient has now minimized its role to simply "collect[ing] payments owed by borrowers" because, contrary to their advertisements, "there is no expectation that the servicer will act in the interest of the consumer."[88]

106.   Navient has fully disavowed its role as an educator of and advocate for student loan borrowers. The federal government's contract with Navient requires Navient to service student loans and serve borrowers' needs. Navient has instead consistently put its own interests before that of borrowers, causing borrowers to suffer significant and unnecessary financial harm and distress. Navient's disinterest in helping borrowers has placed significant numbers of borrowers into positions where they can no longer pay back their student loans.

***Plaintiff was harmed by Navient***

107.   Plaintiff attended Drake University in DesMoines, Iowa. During his time attending Drake University, Plaintiff applied for and received two federal loans to pay for his expenses to attend. Both loans were managed by Sallie Mae, and later,

---

[87] See Defendants' Memorandum In Supp. of the Motion to Dismiss CFPB Complaint, 17-cv0101, ECF 29, at 20.
[88] Id. at 20-21.

Navient. So many years later, Plaintiff is still struggling to pay back his student loans.

108.   After graduating and making years of timely monthly payments, the Plaintiff experienced a significant personal tragedy that resulted in his source of income being reduced suddenly and unexpectedly.

109.   Plaintiff contacted Navient to try and pay a reduced monthly installment until he could resume paying the full monthly installment.  Navient instructed the Plaintiff he either had to go into deferment or pay the full monthly installment.  Navient failed to offer or explain other available options apart from deferment.

110.   When the deferment period expired the Plaintiff resumed making full monthly payments.  As fate would have it, the Plaintiff's income was reduced once again, and the Plaintiff sought to make arrangements through Navient to pay an amount less than the full monthly installment.  Navient instructed the Plaintiff that he either pay the full monthly installment or go into forbearance.  Navient failed to explain to the Plaintiff there were other options available to him seemingly to accrue significant interest for the benefit of Navient while the loan was in forbearance, notwithstanding that was not in the best financial interest of the Plaintiff.

111.   Navient never informed Plaintiff about, nor determined his eligibility for, IDR despite the fact Plaintiff requested all options available to him.

112.    Plaintiff never knew about IDR programs or that he may be eligible for reduced monthly payments. Navient, despite being directly contacted by Plaintiff, never informed him of any other repayment options. Rather, Navient maintained that Plaintiff could either pay the entire monthly payment, or enter forbearance.

113.    Plaintiff suffered financial harm because of Navient's utter lack of interest in providing him meaningful assistance with repaying his loans for its own financial gain.

## FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT  FLA. STAT. ANN. §§ 501.201, *ET SEQ*.

114.    Plaintiff incorporate by reference all preceding and subsequent paragraphs.

115.    Defendants' business acts and practices alleged herein constitute unfair, unconscionable, and/or deceptive methods, acts or practices under the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), §§ 501.201, et seq.

116.    Plaintiff is a "consumers within the meaning of  F.S.A. § 501.203(7).

117.    Defendants' conduct, as set forth herein, occurred in the conduct of "trade  or  commerce" within the meaning of F.S.A. § 501.203(8).

118.   The   FDUTPA   prohibits   "[u]nfair   methods   of   competition, unconscionable acts or  practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce …" Fla. Stat. § 501.204(1).   Defendants participated in unfair and deceptive trade practices that  violated the FDUTPA.

119.  Defendants engaged in numerous unfair acts and practices in the servicing of Plaintiff's loan, including:

Misallocating payments disproportionately to interest rather than principal;

Charging inflated minimum monthly payments and applying the excess payment to interest only;

Applying single loan payments across multiple loans, so as to spread a payment out over multiple loans' principals and interests, rather than one loan's principal and interest;

Applying single loan payments across multiple loans, so as to spread a payment out over loans with the lower interest rate first, so that more debt accrues on the higher interest loans;

Capitalizing interest at irregular frequencies and improper times;

Employing an antiquated, confusing, and misleading online payment system to provide information in order to prevent Plaintiffs and Florida Subclass members from being able to understand their loan payments and applications;

Employing misleading monthly billing statements with inaccurate, deceptive, and confusing information;

120.  Defendants' practices, as set forth above, were unfair because the practices were immoral, oppressive, and unscrupulous because they imposed upon Plaintiff with no meaningful choice, imposed an unreasonable burden on Plaintiff, and were so oppressive as to leave Plaintiff with little alternative but to submit to the practices. Plaintiff had no control over Defendants' acts, and Plaintiff's attempts to ensure that loan payments were applied correctly, were futile; and Plaintiff cannot reasonably avoid the injury caused by Defendants, since

Defendants are in ultimate control of student loan payment processing and routinely refuse to follow Plaintiff's instructions.

121.    Defendants' omissions and practices described herein were likely to, and did in fact, deceive and mislead members of the public, including Plaintiff, acting reasonably under the circumstances, to his detriment.

122.    Defendants failed to reveal facts that were material to Plaintiff's decisions regarding the repayment of his loans, and Defendants intended that Plaintiff would rely upon the omissions.

123.    Defendants' actions impact the public interest because Plaintiff was injured in exactly the same way as hundreds or thousands of others making payments on their student loans as a result of and pursuant to Defendant's generalized course of deception.

124.    Had Plaintiff known the truth about the servicing of his student loans, he would not have made payments in connection with his loans that were improperly allocated and/or were for payment of improper charges.

125.    As a result of Defendants' improper conduct, Plaintiff have suffered damages, including paying inflated principal, interest, and costs associated with his student loans.

126.    The foregoing acts, omissions and practices proximately caused Plaintiff to suffer actual damages which he is entitled to recover such damages,

together with attorneys' fees and costs of suit.

## BREACH OF FIDUCIARY DUTY

127.  Plaintiff incorporates by reference all preceding and subsequent paragraphs.

128.  Plaintiff placed special trust and confidence in Defendants based on their representations that their student loans would be serviced properly.

129.  Defendants knew or should have known that Plaintiff and others similarly situated placed their trust and confidence in Defendants and relied on them to properly service their student loan.

130.  Defendants have a fiduciary duty to borrowers to properly service their student loans.

131.  Defendants breached that duty by failing to properly service Plaintiff's student loans.

132.  As a result, Plaintiffs suffered damages, including paying inflated principal, interest, and costs associated with their student loans.

## <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiff, respectfully request that the Court:

(1)    Enter judgment for liability against Defendants;

(2)    Award compensatory, punitive, and other damages, as may be allowed by law;

(3)    Grant appropriate injunctive and/or declaratory relief, including, without limitation, an order enjoining Defendants from improperly servicing his student loans;

(4)    Grant Plaintiff his attorneys' fees and costs; and

(5)    Grant such other and further relief as the Court deems proper.

## **DEMAND FOR JURY TRIAL**

Plaintiffs hereby request a jury trial on all issues so triable.

Dated: December 12, 2022

By: */s/ Hanton H. Walters*
HANTON H. WALTERS
P.O. BOX 1224
ORLANDO, FL 32802
(407)491-9044
(407)422-4310
hantonwalters@gmail.com
hwalters@drml-law.com
Plaintiff